THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KENNETH CHANEY, Defendant-Appellant.

Fifth District   No. 5—85—0511

Opinion filed June 19, 1987.

James J. Gomric, of Belleville, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, and Joseph J. Ciaccio, Sr., of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Kenneth Chaney, was indicted by a grand jury in St. Clair County on February 7, 1985, for the offenses of aggravated kidnapping, armed robbery, and aggravated criminal sexual assault. Following a jury trial on May 5-7, 1985, defendant was found guilty of aggravated kidnapping and aggravated criminal sexual assault and not guilty of armed robbery. Defendant was sentenced on June 28, 1985, to concurrent terms of imprisonment of 25 years for aggravated criminal sexual assault and 10 years for aggravated kidnapping. Defendant thereafter appealed, raising issues concerning the sufficiency of the evidence and the jury instructions.

The relevant facts are as follows: On December 14, 1984, the victim left her place of employment in National City, Illinois, at about 12:15 to 12:30 a.m. Approaching the stop sign at Route 3 and Eagle Park Road, she noted another vehicle was stopped in front of her. She waited a short time and then backed up to go around the vehicle. At that time, the other vehicle backed towards her and bumped into the front end of her car. She described the other car as being a mid-'70s, full-size blue vehicle. A black man wearing a three-piece suit, between 5 feet 10 inches and 5 feet 11 inches in height and weighing about 180 to 190 pounds got out of the vehicle from the driver's side and apologized for hitting her car. During the conversation a second man got out of the blue vehicle, came towards her car and stated that her headlight had been broken. The victim testified that during this conversation, "two men started rushing the vehicle and before I could move a revolver came through the door right to my head and I was instructed to unlock the door and let them in." The two individuals got into her car with her but the

driver of the blue car did not. The man who came to the driver's side of her car with the revolver was a black male between 5 feet 8 inches and 5 feet 9 inches tall, weighing 170 to 180 pounds. The man who got into the passenger side of her vehicle was a black male approximately the same height and weight but was more fair complexioned. He was also carrying a revolver.

The man on the passenger side pushed the victim's head down and told her not to look at them. He then began removing jewelry from the victim. During this time the victim did not notice what happened to the other vehicle and its driver. The victim stated that her car was driven off with her and the two men inside and that it appeared that they made a U-turn and then proceeded back past the National Stockyards Inn and crossed over Interstate 55-70, going down St. Clair Avenue. Another car came up beside them quickly along the passenger side and its occupant was trying to get their attention. She believed it was the same car that had backed into her at the stop sign. They finally ended up on a dead-end street. After stopping, the two men told her to get into the back. At that point in time she noticed the headlights of another car coming up behind them, and, again it appeared to be the same man in the car that had backed into her at the stop sign. One of the men got out of the victim's car and went back and spoke to the driver of the car behind them. The driver of the car behind them "told the man, he said I don't want any part of any rape or killing. He said I've been in jail before and I'm not going—he goes, I'm going to get out of here and he left." After the driver of the second vehicle drove away, the same man who had left the victim's vehicle got back into the car.

Up to that point in time the victim had not been able to see, or view, the two individuals in her car. The two males told her to get in the back seat and put the seat down. After the victim got into the back of her car, the two men told her to remove her clothing, at which time she remembered that she was wearing a gold ankle chain, which they removed. One man got in the back seat with her and started having sex with her by placing his penis in her vagina. That was the first time the victim was able to see his face. The second man also got in the back seat and placed his penis into the victim's mouth. She believed that it was the passenger who first had intercourse with her. When the first man was finished, he got out of the car and shut the door. The second man then began having intercourse with her. The first man then opened the car door and yelled to the second man to throw him his pants. The second man threw out the pants and told the first man, whom he called Leon, to shut

the door. She was never able to see the face of the second man because he was very careful to keep his face away from her. When the second man finished, he also got out of the car. As she was trying to put on her clothes, they made her get out of the car. While she was looking for an extra set of keys to the vehicle, she again looked at the face of the man called Leon. The two men told her to start walking. She walked towards a wooded area where she kicked off her shoes and began to run. She was picked up by a motorist and taken to the National City police department. The victim testified that the two men had taken from her on the night of the occurrence two gold bracelets, three sets of earrings, a gold diamond ring, a gold band, a solitary diamond, a white gold wedding band, and a gold ankle chain.

The victim accompanied two East St. Louis police officers to the scene of the rape, North 35th Street in East St. Louis, St. Clair County, where her car was still parked. They found her shoes in the field. The victim was taken to St. Elizabeth's Hospital in Granite City and arrived there around 5 or 6 in the morning.

The victim subsequently learned that the owner and driver of the vehicle which backed into her was a Jackie Wilson. The victim stated that one of the men who had intercourse with her on the night in question and who was occupying the passenger seat of her car was referred to as Leon. She subsequently identified him from pictures at the police station and later learned that his name was Leon Gulley. The victim also stated that Leon Gulley referred to the other male driving her vehicle on the night in question as Jules or Julian. The victim admitted that she saw the defendant, Kenneth L. Chaney, at the police station sometime after the incident but was unable to identify him as the other male involved in her rape.

Thomas Verbeck, a police officer from National City, testified that he observed the victim at approximately 1:10 a.m. on December 14, 1984. He observed that the victim was in a very emotional state, hysterical, crying, and wringing her hands. Her clothes appeared to be soiled and wrinkled, and she made a statement that she had just been raped.

John E. Smith of the Internal Affairs Division of the East St. Louis police department testified that he was asked by Detective Boone to listen to a tape of an anonymous telephone call recorded on the police department's communications system, which tapes all incoming calls to the East St. Louis police department. He listened to the tape and identified the voice on the tape as being that of Kenneth Chaney, the defendant. He stated that he has known the

defendant for over three years and had heard him speak approximately 100 times. Officer Smith related that defendant's father, Julius Young, was employed by the East St. Louis police department at one time. Isadore Chambers, a police officer for the East St. Louis police department, listened to the same tape and also recognized the voice as that of the defendant. Chambers stated that he has known the defendant for two years and over the two-year period has had quite a few conversations with him.

Detective Walter L. Boone of the East St. Louis police department testified that he was assigned to investigate the kidnapping, rape and armed robbery. Detective Boone testified that after defendant's voice was identified as the voice on the tape, he visited the residence of Mr. Julius Young, who was not actually related to the defendant, but was a "make-believe" father. On December 28, 1984, the defendant contacted Detective Boone, at which time Detective Boone advised the defendant he wanted to talk with him regarding a telephone call. The defendant voluntarily came to the police station to talk with Detective Boone. Detective Boone advised him that he was not under arrest but read him his *Miranda* rights. Detective Boone testified that the defendant then indicated that he had met Jackie Wilson, Terry Lewis, and Leon Gulley at a liquor store where they told him (the defendant) about kidnapping and raping the white woman in the red Camaro. Defendant related that he left to make the phone call at this point. Detective Boone also stated that the defendant requested several times that the victim be allowed to see him and Boone told him that he was not under arrest and that it would be a one-on-one lineup.

The victim did subsequently see the defendant and stated that she could not identify him as one of the suspects. However, she did indicate that he matched the height and weight of one of the individuals involved. Jackie Wilson was then arrested. Detective Boone stated that he relayed to Jackie Wilson the information that defendant had given him in reference to Mr. Wilson, Mr. Lewis and Mr. Gulley being involved in the kidnapping, sexual assault and armed robbery. Detective Boone further testified that Jackie Wilson advised him that he (Boone) had it all correct except that Mr. Lewis was not with them. Jackie Wilson admitted that he was driving the car that backed into the victim's car and he stated that it was Leon Gulley and Kenneth Chaney who got into the victim's car and raped and robbed her. Defendant was then arrested and was advised of the information that was received from Jackie Wilson in reference to the defendant's involvement. Detective Boone testified that initially the

defendant stated, "Yeah, I was with the other three guys," indicating there were four at that time. Boone then went back to Jackie Wilson, advising Mr. Wilson of the information they had just received from Mr. Chaney, and Mr. Wilson stated that the defendant was lying. Detective Boone then confronted defendant with Mr. Wilson's statement and the defendant then said that he did it and that he and Leon got into the victim's car and raped and robbed her.

Detective Boone identified a yellow gold diamond ring, marked as people's exhibit No. 3A, as being a ring that he had received from Suzanna Davis on or around January 8, 1985. The victim positively identified the ring as being one item of the jewelry taken from her during the armed robbery, abduction and criminal sexual assault. Detective Boone testified that the police department attempted to lift fingerprints from the victim's car but were unable to do so. He also stated that the Madison County/St. Clair County boundary line is very close to the stop sign where the victim's car was initially stopped. He testified that Brooklyn, National City and all but a few feet next to the stop sign along Route 3 are all in St. Clair County. He also stated that stop sign was about 50 to 100 feet from the St. Clair County line and that the stop sign itself, plus the 50 to 100 feet, is in Madison County.

Special Agent Robin Blaha, of the Illinois Department of Criminal Investigation, assisted the East St. Louis police department in its investigation of the armed robbery, sexual assault and aggravated kidnapping. He testified that on December 28, 1984, the defendant stated initially that he had met with Jackie Wilson, Leon Gulley and Terry Lewis in the early morning hours of December 14, 1984, at a liquor store where these three individuals admitted to the abduction, armed robbery and sexual assault of a white female earlier that night. Agent Blaha confirmed that the victim was unable to identify the defendant that day (December 28, 1984) after bringing the two into contact with one another. Pursuant to the information received from the defendant, Detective Boone and Agent Robin Blaha arrested Jackie Wilson. Agent Blaha testified that Jackie Wilson admitted driving the vehicle that backed into the victim's car and that Leon Gulley and the defendant were with him on the night in question. Defendant was then arrested, and, when advised of Jackie Wilson's statement, stated that he in fact was present and was with Mr. Wilson, Leon Gulley and Terry Lewis. Defendant first stated that he did not personally take part in either the robbery, sexual assault, or abduction. When confronted again with Mr. Wilson's statement regarding the positive identification of the people who were with him,

the defendant admitted that he and Mr. Gulley had actually abducted, robbed and sexually assaulted the victim and stated that Leon Gulley kept all of her jewelry.

Thomas O'Connor, an agent with the Illinois Division of Criminal Investigation, testified that he was present with Detective Boone and Agent Blaha when they conducted an interview with the defendant. Agent O'Connor stated, "I heard Mr. Chaney state specifically that on the night of the incident he was with a Mr. Leon Gulley, a Terry Lewis and a Jackie Wilson. He subsequently stated that Terry Lewis was not present, that it was Leon Gulley, Jackie Wilson and himself and that he, Mr. Chaney, and Leon Gulley had assaulted, sexually assaulted and robbed the female and that Leon Gulley had taken the jewelry from the white female and that Leon Gulley subsequently gave the jewelry to his girlfriend."

Rochelle Rogers testified that Leon Gulley was her boyfriend and identified people's exhibit No. 3A as being a diamond ring that was given to her by the defendant. She also stated that she subsequently sold the diamond ring to a Miss Susie, also known as Suzanna Davis. Suzanna Davis testified that she purchased the gold diamond ring, marked people's exhibit No. 3A, from Rochelle Rogers.

Dennis Aubuchon, a forensic serologist with the State of Illinois, was certified by the court as an expert in the field of serology. He determined that the victim was an ABO Type O blood type, and that she was a Lewis secretor. He also determined that the defendant was an ABO type O blood type and he was a Lewis nonsecretor. After typing the blood of the defendant and the victim, he was able to draw some conclusions as to the possible source of the seminal material on vaginal and rectal swabs examined by him. He found no ABO activity in the seminal fluid on the vaginal or on the rectal swabs taken from the victim which indicated to him that a nonsecretor would have been the source of the seminal materials. He also stated that approximately 30% of the black population would be ABO nonsecretors. His conclusion was that there was seminal material present when the vaginal and rectal swabs were tested, which indicated that intercourse took place, and that an attempt to type the seminal fluid to determine possible "donors" included the defendant as a possible "donor" of the seminal fluid. There was no indication of the defendant's hair samples being in any way identified on the victim's clothing or anywhere else. Likewise, the fingernail scrapings showed nothing that would apply to the defendant. He also stated that his blood findings merely indicated that the defendant could not be excluded as a possible source of the seminal fluid found on the

rectal and vaginal swabs taken from the victim.

Jackie Wilson admitted being with the defendant and Leon Gulley on December 14, 1984, and accidentally backing into the victim's car at a three-way stop sign near Brooklyn, Illinois. He stated that he observed the defendant with "a gun on the lady." Jackie Wilson got into his car to go home and the last thing he observed was the defendant "trying to open the door to get inside." He became concerned for the woman and began looking for the defendant, Leon Gulley and the victim. He ran into them again on Route 3. The defendant was driving the victim's car with the victim in the middle and Leon Gulley on the passenger side. He tried to talk them out of doing anything foolish. He then followed them down a dead-end street to an area near Jones' Park where they pulled into a driveway of a vacant house. He testified that he again stopped and told them that he was not going back to jail, stating, "I didn't want to get involved and I told them not to involve me in it." He then went home.

Defendant's first contention on appeal is that the foregoing evidence was insufficient for the jury to find him guilty of aggravated criminal sexual assault and aggravated kidnapping in view of the fact that the victim was unable to identify him as one of the two men who kidnapped and raped her.

When presented with a challenge to the sufficiency of the evidence, it is not our function to retry the defendant; and a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77.) The court in *Collins*, quoting from *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, stated: " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

In view of these principles, we conclude that defendant's admission, coupled with the other evidence in the record, overwhelmingly supports the jury's verdict in the instant case. Two black males, who were both approximately 5 feet 8 inches to 5 feet 9 inches tall,

weighing 170 to 180 pounds, and carrying guns, stopped the victim on December 14, 1984, and forced their way into her car. The same two men took her jewelry and transported her in her own vehicle to a place where they both had sexual intercourse with her against her will. The victim subsequently identified one man as Leon Gulley and identified people's exhibit No. 3A as being a ring taken from her on the night in question by the two men. Detective Boone recovered the ring from Suzanna Davis, who had bought it from Rochelle Rogers. Rochelle Rogers was Leon Gulley's girlfriend. Rochelle Rogers obtained the ring from the defendant. The defendant initially stated that a Jackie Wilson, Terry Lewis and Leon Gulley admitted to him that they raped and robbed the victim. He then stated that he was also present but had nothing to do with the rape and robbery, indicating that there were four individuals involved. When confronted with statements made by Jackie Wilson, the defendant admitted that he and Leon got into the victim's car and raped and robbed her.

Jackie Wilson admitted being with the defendant and Leon Gulley on December 14, 1984, and accidentally backing into the victim's car at a three-way stop sign in Brooklyn, Illinois. He observed the defendant holding a gun on the victim, trying to open the victim's car door and driving the victim's car along Route 3 with the victim in the middle and Leon Gulley riding on the passenger side. He also followed the victim's car with the three individuals inside down a dead-end street and into a driveway of an old vacant house near Jones' Park in East St. Louis. Jackie Wilson testified that a day or two later he ran into the defendant and the defendant stated that he had oral sex and sexual intercourse with the victim. Vaginal and rectal swabs taken from the victim after the incident were examined by a forensic serologist who found seminal material on the swabs indicating that intercourse took place. The serologist was able to determine from the blood samples taken from the defendant that the defendant had type O blood and was a Lewis nonsecretor. He further determined that the seminal fluid found on the vaginal and rectal swabs taken from the victim indicated that a nonsecretor would have been the source of the fluid. The forensic serologist concluded from the test that the defendant could not be excluded as a source of the seminal fluid.

In *People v. Sims* (1966), 74 Ill. App. 2d 352, 220 N.E.2d 3, a case involving a prosecution for rape, armed robbery, and aggravated kidnapping, the victim, as in the case at bar, could not identify her assailant. The defendant's conviction was affirmed, however, with the court concluding that defendant had been proved guilty beyond a

reasonable doubt. Likewise, in *People v. DeMorrow* (1974), 17 Ill. App. 3d 901, 308 N.E.2d 659, *affirmed* (1974), 59 Ill. 2d 352, 320 N.E.2d 1, the 12-year-old victim could not identify her assailant in a lineup. The court stated, however, that the decision of the trier of fact when based on credible and substantial evidence would not be set aside on review unless the evidence was so unsatisfactory as to raise a doubt as to the defendant's guilt. 17 Ill. App. 3d 901, 910, 308 N.E.2d 659, 665-66.

■ In the instant case, when defendant was confronted with statements made by Jackie Wilson, he admitted that, together with Leon Gulley, he had raped and robbed the victim. Defendant's admissions were made in the presence of a detective from the East St. Louis police department and two agents with the Illinois Division of Criminal Investigation, all. of whom so testified at trial. Jackie. Wilson's testimony placed the defendant and Leon Gulley at the scene on the night of December 14, 1984, armed with guns and in the company of the victim. Wilson's testimony was substantially corroborated by the testimony of the victim. Mr. Wilson also testified that a few days after the incident, the defendant admitted to him that he robbed and raped the victim. Defendant was further implicated by the fact that he had possession of the victim's gold ring sometime after the incident.

From our review of the record, we find that the evidence overwhelmingly supports the jurors' verdict and that the defendant was proven guilty beyond a reasonable doubt of aggravated criminal sexual assault and aggravated kidnapping.

■ Defendant's second contention on appeal concerns the sufficiency of the jury instructions. Defendant contends that the trial court erred in refusing to properly instruct the jury as to an alleged venue issue and as to the weight to be given to the testimony of a witness allegedly involved in the commission of the offense.

Defendant argues that the State's witness, Jackie Wilson, was an accomplice and under the circumstances, the trial court's refusal to give Illinois Pattern Jury Instruction, Criminal, No. 3.17 (2d ed. 1981) was error.

Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) provides:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

At the instruction conference, the trial court refused defendant's instruction regarding the testimony of an accomplice. The trial court concluded that the testimony did not support the conclusion that Jackie Wilson was an accomplice. We agree. To be accountable, a person must have the mental state required for the offense, and before or during the offense he must aid in its commission. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2.) Merely showing that a person's acts facilitated another's commission of an offense is not enough. It must be shown that the conduct which facilitated the subsequent offense occurred with the intent that such offense be committed. (*People v. Lashmett* (1984), 126 Ill. App. 3d 340, 347, 467 N.E.2d 356, 362.) The evidence indicates that Jackie Wilson was not an accomplice by reason of the fact that he was not shown to be a principal nor was he accountable for the conduct of defendant or Leon Gulley.

In the instant case, it is not enough to show that Jackie Wilson's act of backing into the victim's car facilitated or aided the defendant in kidnapping and raping the victim. It is necessary that the trial court find from the evidence presented that there was probable cause to conclude that Jackie Wilson's conduct, which facilitated the offense, occurred with the intent that such offense be committed. From our review of the record, we conclude that there was no evidence showing that Jackie Wilson backed into the victim's car with the intent to facilitate the kidnapping and rape of the victim by the defendant. In fact, the evidence was to the contrary. The victim testified that she heard Jackie Wilson say that he didn't want to go to jail and wanted no part of any rape or killing. Jackie Wilson testified that he followed the victim and her assailants because he was concerned for her welfare and wanted to try to talk them out of doing anything stupid. Under the circumstances, the trial court was correct in concluding that Jackie Wilson was not an accomplice. Therefore, it was not necessary to give Illinois Pattern Jury Instruction, Criminal, No. 3.17 (2d ed. 1981).

■ Defendant also urges that the trial judge should have given the jury an instruction on venue. Defendant contends that the testimony of the complaining witness and each of the officers raised a question as to venue. Defendant contends that the testimony showed that the robbery and kidnapping occurred at an intersection in Madison County, not St. Clair County. Defendant concludes that when the issue of venue is raised, the jury should be instructed on that issue and it is for the jury to make the factual determination. Defendant concludes that the court invaded the province of the jury by failing to instruct on the issue of venue.

When the evidence raises a question of the propriety of venue, a tendered instruction must be given indicating that the State is required to prove beyond a reasonable doubt that each element of the offense charged occurred in the county in which the crime was alleged to have been committed. (*People v. Smith* (1980), 91 Ill. App. 3d 242, 414 N.E.2d 751.) There is no need for a jury to be instructed regarding a finding of venue where that issue is uncontroverted by the evidence. *People v. Anderson* (1934), 355 Ill. 289, 189 N.E. 338.

■ In the case at bar, we find that there is no evidence that suggests that the rape of the victim took place anywhere other than in St. Clair County. The evidence leaves no doubt that the offense took place on North 35th Street in East St. Louis, St. Clair County. Likewise, the kidnapping of the victim may have begun on or about the St. Clair/Madison County lines, but she was immediately transported into St. Clair County through Brooklyn, National City and then into East St. Louis, where she was raped. All of these locations are shown by the evidence to be in St. Clair County. Section 1—6(i) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 1—6(i)) provides that a person that commits the offense of kidnapping may be tried in any county in which his victim has travelled or has been confined in the course of the offense. Venue therefore lies in any county in which the victim has travelled. There is no evidence that suggests that the victim did not travel into St. Clair County during her ordeal on December 14, 1984. The fact that her kidnapping may have begun in Madison County or on the Madison County/St. Clair County line does not inject the issue of venue into the case. In any event, the alleged error, if any, was harmless inasmuch as the testimony presented at trial was sufficient to establish venue beyond a reasonable doubt. *People v. McClain* (1978), 60 Ill. App. 3d 320, 376 N.E.2d 774.

For the reasons stated above, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KARNS, P.J., and WELCH, J., concur.