THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN HOFFSTETTER, Defendant-Appellant.

Fifth District No. 5—87—0646

Opinion filed August 17, 1990.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

William Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

The defendant, Steven Hoffstetter, was charged by information in Madison County with the murders of Della Riggins, Kevin Burch and Christopher Schrom and with armed robbery and home invasion. A jury found the defendant guilty of armed robbery, home invasion and three counts of murder. The State requested a hearing to determine whether the death penalty should be imposed. However, the State later withdrew this request and the circuit court imposed the manda-

tory sentence of life imprisonment for each count of murder and concurrent sentences of 30 years' imprisonment each for armed robbery and home invasion.

The defendant raises the following issues: (1) whether the State failed to prove him guilty beyond a reasonable doubt; (2) whether the circuit court erred in making certain evidentiary rulings; (3) whether the circuit court erred in not instructing the jury on accomplice-witness testimony and the credibility of a narcotics addict; and (4) whether he was denied his right to a fair trial as a result of prosecutorial comments during closing argument.

The following evidence, *inter alia*, was presented by the State at the defendant's trial. The remains of three people, which the parties stipulated to be Della Riggins, Kevin Burch and Christopher Schrom, were discovered on the morning of October 7, 1985, in the family room of Schrom's burned-out residence in rural Edwardsville, Illinois. East Alton Fire Chief William Schumacher testified that he and an investigation team examined the scene and determined the cause of the fire to be use of combustible or flammable liquid. In Schumacher's opinion, the liquid had been poured on the bodies and had then been trailed out the south door of the family room.

Mark Johnsey, a crime scene technician and forensic archeologist with the Illinois Department of State Police, testified that Riggins' and Burch's bodies were found lying on the coil springs from a couch and Schrom's body was found lying on the floor in front of a large open safe. Johnsey collected various items of evidence, including shell casings and several firearms, from the scene and observed the autopsies performed on the bodies by pathologist Dr. William Drake. Johnsey testified that at the autopsy a projectile was removed from the head of Della Riggins and two pieces of metal were taken from her body. Projectiles were also removed from the left side and left collarbone of Kevin Burch's body, and from the upper right chest of Christopher Schrom's body.

Illinois State Police forensic scientist James Hall testified that the lead fragments removed from Riggins' body appeared to be .22 caliber, although no specific determination could be made. The projectiles removed from Burch's and Schrom's bodies were identified as .22 caliber spent bullets. Although Hall could not positively identify any of the recovered bullets as having been fired by the same weapon, he did determine that none of the weapons found at the crime scene could have fired the bullets. Hall stated that at least 13 types of weapons, including one manufactured by Ruger, could have discharged the recovered projectiles.

Steven Howland testified that he was incarcerated in the Madison County jail with the defendant between May 19 and June 3, 1986. On July 24, 1986, Howland contacted the Madison County sheriff's office and informed them that during his incarceration the defendant had spoken with him about the murders of three people. According to Howland, the defendant stated that the shootings resulted from an argument over drugs and drug money. The defendant told Howland that he had shot one of the men and the woman, and that his friend, whose last name was Fischer, had shot the other man. According to Howland, it was the defendant who decided to burn the house in order to dispose of evidence. The defendant told Howland that he had thrown his gun into a sewer, but that Fischer had kept his gun for a longer period of time.

Three to four days after Howland's release from the county jail, he received a letter that he believed came from the defendant, requesting help in escaping from the jail and warning Howland not to testify against him. Within the next week, Howland received a second letter, which was similar to the first in content. Both letters appeared to be signed "Hoffstetter," but the signatures had been partially erased. Howland testified that he had also received two collect telephone calls from the defendant at the Madison County jail requesting his assistance in escaping. These calls, which came on successive days about a week after Howland's release, were answered by his mother, who stayed on the line and overheard the second conversation. Howland claimed to have told Hoffstetter that he would not assist him.

Howland admitted that it was the fact that his mother and "other people in the jail" knew about the calls and might have notified the authorities that led him to contact the sheriff's department. Additionally, Howland stated that a former jail inmate who had overheard his conversation with the defendant came to his house and told Howland's mother that he should not get involved in the case. At the time Howland notified the authorities, he was on probation for burglary, but was not "in any trouble," and neither asked for nor received any special consideration in exchange for the information. His probation term expired several weeks before he testified at the defendant's trial.

Joyce Casius, Howland's mother, also testified concerning the various telephone calls and letters that her son received after his release from the Madison County jail. Mrs. Casius stated that within a month of her son's release, she accepted a collect call from someone named Steven, whose last name she did not remember, because she thought

the caller was her son's probation officer. After the caller asked to speak with Steve Howland, Mrs. Casius called her son to the phone but remained on the extension. When she heard the caller ask her son about a gun that he had promised to bring to him, she interrupted the call and told the caller that her son was not bringing him a gun and that if he called again she would contact the Madison County sheriff.

Approximately one week later, a man approached Mrs. Casius in front of her home and asked if Steven Howland lived there. Upon learning that he did reside there but was not at home, Mrs. Casius stated that the man said, "Well, tell Steve that I said not to testify against that guy *** or it could cause trouble for your whole family." Mrs. Casius further testified that she had read two letters her son received after his release from jail. The letters were not mailed from the jail but instead bore a Collinsville, Illinois, return address. The first letter referred to her son's promise to "bring me up [*sic*] a gun," and the second, received a week later, chided him for his failure to help.

The State's only occurrence witness, Tina Marie Rose, testified that she had known the defendant for approximately 13 years. In late September 1985, Rose moved to a residence on Viewland Street in Alton, Illinois, and discovered that the defendant lived across the street. She began visiting the defendant's house on a regular basis and stated that David Schenk and Tony Fischer sometimes stayed with the defendant.

Ms. Rose testified that around 9 p.m. on an evening in early October 1985, after she, Tony Fischer and the defendant had been "partying" at defendant's house, *i.e.*, "smoking reefer, doing cocaine *** off and on for two or three days," the defendant made a telephone call and then asked Rose to give him a ride to collect some money. Ms. Rose agreed and the three set off in her car, with the defendant telling her to drive toward Edwardsville and then requesting that she stop at the Oasis Tavern so that he could make a telephone call. According to Rose, the defendant next directed her to a farmhouse, where he instructed her to wait until he returned. Rose and Fischer stayed in the car while the defendant went into the farmhouse.

Ms. Rose testified that the defendant returned about five minutes later, saying "something about the guy didn't have the money." As she was backing the car out of the driveway, the defendant and Fischer pulled guns out and started checking them. When Rose questioned what they were doing, the defendant told her, "we are going to rob these people." Ms. Rose testified that she then stated "well, I don't know," and began driving back toward the Oasis.

At the Oasis, the defendant made a phone call while Rose and Fischer had a drink. Upon leaving the Oasis, the defendant began driving the three back to the farmhouse. Rose stated that she believed the defendant and Fischer had long-barrelled automatic pistols and some nylon stockings taken from her car. At this point, Rose claimed that she told the defendant and Fischer that she did not want to have anything to do with the robbery and wanted out of the car. The car was stopped near a cornfield, and Rose got out and waited until the men picked her up between 10 and 15 minutes later.

According to Rose, upon their return, the defendant and Fischer were arguing and Fischer stated that he had had to shoot a man in the leg. Ms. Rose testified that the defendant was complaining because he had blood on his new boots. As they were driving, the defendant handed Rose $60 to $80 and a small amount of cocaine. The two men also gave Rose a knife sheath, an item of drug paraphernalia called a "pinch hit," and some empty plastic bags and told her to throw them out the car window, which she did. Fischer, who was seated in the back of the car, was rifling through the contents of a bag which Rose later learned contained a quantity of quaeludes and amphetamines.

Ms. Rose estimated the distance between the cornfield and the farmhouse as "a couple miles," and testified that she did not see a fire or hear any gunshots during the time that she waited for the defendant and Fischer to return. Rose testified that although the two men had said they were going to rob the people in the farmhouse of $4,000 to $8,000 and three or four ounces of cocaine, "when they got back, they said they didn't get very much." After picking her up, the defendant began driving home, but Rose told him to pull over because he was driving "a little radical," and she drove back to Alton.

Ms. Rose admitted that the first time she told police of this incident was on April 14, 1986, when she was arrested and charged with two counts of delivery of a controlled substance. Ms. Rose said that she voluntarily gave a statement on April 14 and denied that any promises were made to her at that time. Rose testified that she pled guilty to two counts of delivery of a controlled substance and was sentenced on January 28, 1987, to one year of intensive probation and one year of regular probation. However, on cross-examination, she stated that she was "not sure if I pled [guilty] to two [counts] or one of them."

Although Ms. Rose was charged with home invasion and armed robbery in connection with the Edwardsville incident, she testified that she anticipated not being prosecuted for those charges. Ms. Rose

admitted that when she made her statement to police on April 14, 1986, implicating the defendant and Fischer in the homicides, the police had already indicated to her that they had information connecting those two men to the crimes. Rose stated that she was arrested at approximately 10:30 a.m. on April 14 and was questioned until 2 or 3 a.m. the following morning. During the day's questioning, Rose was supplied with methadone from the methadone clinic.

During cross-examination, Ms. Rose admitted making certain statements to Rodney Mullane, who sometimes worked as an undercover agent for the Metropolitan Enforcement Group. Rose testified that she met Mullane in late November or early December 1985. At that time, Mullane resided at the Bon Air Hotel in Alton where Rose was working selling drugs and as a prostitute. Rose admitted that during December 1985, she "might" have told Mullane that: (1) a friend of hers, Jody Wesley, and two accomplices had robbed a drug dealer in Edwardsville; (2) she had anticipated getting $4,000 and some cocaine, but that Wesley had not counted on the dealer having a gun and had had to shoot him; (3) Wesley and his accomplices had worn nylons on their heads and that Wesley had tied up three dealers but had shot only one dealer who refused to open the safe.

Ms. Rose admitted that the incident she described to Mullane and the one described in her April 14 statement to police were basically the same, except that her statement named the defendant and Fischer as the men involved. Rose testified that the day after the incident described, she read in the newspaper that three people had been shot and killed.

Although Rose stated that she no longer considered herself to be a drug addict, she had been addicted in October 1985, taking cocaine and other drugs on a daily basis. Rose stated that her drug use had increased after she read of the murders and that she was "usually pretty high" when she talked to Mullane. Rose further stated that she was "blowing [Mullane] a lot of hot air because Jody and Tommy [House] was [sic] coming over, and I wanted him to be scared of [Jody] because they didn't want him around when they would come over and party." Rose admitted that Wesley and House often visited her at the Bon Air Hotel and provided her with drugs.

Ms. Rose admitted that on December 11, 1985, she "might" have told Mullane that she, Wesley, Fischer and House were going to "do another drug dealer," and that she was going to drive, as she had done when Fischer shot the dealer in Edwardsville. However, on December 30, 1985, Rose told Mullane that Wesley and House had nothing to do with the Edwardsville murders, that she had driven the car

for Fischer and two of his friends and that Fischer had shot one of the dealers. Rose admitted that in November and December 1985 she possessed a .22 caliber weapon that Wesley had given her.

Deputy Ronald Tune, Madison County sheriff's department, testified that he arrested Tina Rose on April 14, 1986, in connection with contempt and drug charges. After being taken to the station and advised of her *Miranda* rights, Rose agreed to talk with police. Tune then told Rose that the police had information that she was involved in the murders of Christopher Schrom, Della Riggins and Kevin Burch. When Rose denied any knowledge of the crimes, Tune responded that his information indicated that she had driven Fischer and the defendant to the scene. Rose then said she would tell police "everything she knew." Tune stated that at the time Rose gave her statement, no promises were made to her regarding charges stemming from the offenses committed at the Schrom residence. Tune admitted that while Rose had been charged with home invasion and armed robbery, she was later told that the charges would not be prosecuted.

David Schenk testified that he had lived with the defendant on Viewland Street in Alton during the summer and fall of 1985. At that time, Schenk owned a .22 caliber Ruger handgun, which he kept under the mattress of his waterbed. Following Tony Fischer's release from jail in the fall of 1985, he stayed with the defendant and Schenk for a short time. During Fischer's stay, Schenk discovered that his gun was missing for a day or two, although he could not pinpoint the exact time. Schenk told the defendant that the gun was missing and that he thought Fischer had taken it. Several days later, the gun reappeared under Schenk's mattress. Schenk's gun disappeared again in December 1985 or January 1986 and was never returned.

Cynthia Proffer testified that she was the former girlfriend of Tony Fischer and that she was living with Fischer and the defendant on Viewland Street in Alton when Fischer was arrested in March 1986. After Fischer's arrest and subsequent incarceration at Hillsboro, Proffer moved to a residence in Wood River where she had a phone installed in Fischer's name. Mrs. Proffer testified that this phone had a three-way calling feature. Sometime in early April 1986, she received a call from Fischer at Hillsboro. Mrs. Proffer testified that Fischer asked her to forward the call to the defendant at another residence. When this task was accomplished, she remained on the line and heard Fischer ask for the defendant.

According to Mrs. Proffer, the two men talked about the defendant leaving town and Fischer then asked the defendant to get in

touch with Tina Rose and "to get rid of Tina, that he (Fischer) was worried about Tina." Proffer testified that the defendant told Fischer that he wasn't worried about Tina. Mrs. Proffer identified People's exhibit No. 51 as Fischer's phone bills for the months April through June 1986. These bills, admitted into evidence, show numerous calls made from Hillsboro to Fischer's phone number during April 1986.

Mrs. Proffer testified that she had married Noel Proffer on January 22, 1987, but that Mr. Proffer was arrested the following day. On January 26, 1987, Mr. Proffer was taken to the Madison County jail and charged with burglary. On January 28, 1987, Mrs. Proffer spoke with Detective Fischer of the Madison County sheriff's department and offered to give information concerning Tony Fischer in return for leniency for her husband. In exchange for this information, the Madison County State's Attorney's office promised to reduce Mr. Proffer's sentence to six years and to dismiss any charges which might be filed against Mrs. Proffer in connection with a separate burglary.

Karen Ferrera, an assistant manager for Illinois Bell, identified People's exhibit No. 52 as a copy of a phone bill listed in the defendant's name at 2707 Viewland in Alton. According to Ms. Ferrara, the bill indicated that on October 6, 1985, telephone calls were made at 8:50 and 9:01 p.m. from the Hoffstetter residence to a phone number in Edwardsville. That number, 618-692-0080, was the same number listed on a copy of the October 1985 bill for the Christopher Schrom residence. Ms. Ferrara also testified that telephone records for the Tony Fischer residence in Wood River indicated that Mr. Fischer's service included three-way calling.

Rosemary Hickerson testified that she had known the defendant since grade school and that she was presently serving a three-year Federal prison sentence for a drug conviction. Ms. Hickerson stated that a month or two before Schrom's death, she had given the defendant two pounds of marijuana to sell for $500 or $550 per pound. The defendant told Hickerson that he had given the marijuana to Schrom to sell. Thereafter, Hickerson told the defendant that she needed to receive payment for the marijuana, but the defendant told her that he did not have the money. Hickerson stated that she had several conversations with the defendant about collecting the money from Schrom and that the defendant had made some partial payments, but had told her that he could not get any money from Schrom because Schrom had mixed the marijuana with some of lesser quality, and it was no longer any good. Ms. Hickerson estimated that the last time she spoke with the defendant about the

money he owed her was a week before Schrom's death.

Ms. Hickerson identified People's exhibit No. 54 as a tape which came from her telephone answering machine and which contained a threat made by the defendant to her on April 16, 1986, between 6 and 6:45 p.m. Hickerson testified that she knew the defendant's voice well and that the voice on People's exhibit No. 54 belonged to the defendant. The tape, which was played for the jury, consisted of an initial message to all callers, followed by this message:

"This is Stevie, I need some bond money, Rosie, or I'm going to have to bring you in on this shit. You know you was [sic] in on planning the robbery on them [sic] mother fuckers now, you bitch. If you don't help me get out of Jail, I'm going to kill you next."

Ms. Hickerson was interviewed by police several times in the months following the murders and again in April 1986 after turning the tape over to police. On cross-examination, Ms. Hickerson admitted that she had denied to police any involvement in sending the defendant to Schrom's residence to get money, and continued to deny any involvement even after the State's Attorney's office offered her immunity if she had information relevant to the case.

Louis Colone, assistant jail superintendent at the Madison County jail, testified that according to jail records, the cell block which housed the defendant had telephone access from 9 a.m. until 11 a.m. and from 6 p.m. to 7 p.m. on April 16, 1986. Cynthia Proffer was recalled to the stand and testified that the voice on People's exhibit No. 54 was that of the defendant.

Jennifer Whitworth, a classmate of the defendant in junior high and high school, testified that she had last seen the defendant on a regular basis during the summer of 1985. She stated that she was familiar with the defendant's voice, both in person and on the telephone, and that the voice on People's exhibit No. 54 was that of the defendant. Whitworth stated that while she had never heard the defendant refer to himself as "Stevie," a lot of people did, including the defendant's father.

The defendant presented evidence, *inter alia*, that forensic serologist Debra Depscynski had tested boots taken from the defendant on April 14, 1986, and floor mats and carpeting taken from Rose's automobile on April 17, 1986, for traces of blood, but had found none on any of the items. Depscynski testified that unless the items had been cleaned, blood would have been found. Nylon stockings taken from Rose's automobile were never submitted to the crime lab for analysis.

Paula Wardle, Madison County deputy circuit clerk, testified that

court records showed that Judge P.J. O'Neill had ordered the defendant held without bail on April 15, 1986. The defendant was taken into custody and made his initial court appearance on April 16, 1986. Ms. Wardle stated that it is the routine practice of the court to advise defendants of their bond status at their initial appearance.

Henrietta Kauble, the defendant's mother, testified that she visited her son at the Madison County jail on April 16, 1986, between 6:30 and 7 p.m. Mrs. Kauble stated that at that time her son was aware that he was being held without bond. She further testified that she recognized her son's voice, that the voice on People's exhibit No. 54 was not that of her son, and that she had never heard her son refer to himself as "Stevie."

Ronald Crane testified that he had known the defendant for 15 years and that the voice on People's exhibit No. 54 was not that of the defendant. David Schenk testified that he had known the defendant for approximately 10 years and that the voice on People's exhibit No. 54 was not that of the defendant. Although Schenk had heard the defendant referred to as "Stevie," he said that the defendant did not care for that name.

John J. Fields, Madison County jail superintendent, testified that jail records showed that the defendant had been visited by his mother, Henrietta Kauble, on April 16, 1986, and that visiting hours on that date were 6:30 to 8 p.m. Fields stated that the jail log did not indicate that any letters had been mailed by the defendant or anyone in the jail to Steven Howland. However, it was common for an inmate to mail a letter to one individual which contained a letter to be forwarded to a separate individual.

Herbert Clay, case manager for the Intensive Supervision Program of Madison County, testified that he supervised Steve Howland's probation following his sentencing on June 3, 1986. Clay stated that petitions to revoke probation had been filed on Howland on July 29, 1986, and December 6, 1986. In each case, Howland's probation term was modified to include jail time, although the probation office had recommended that Howland be sentenced to the Department of Corrections based on the second petition to revoke. Howland's probation term ended on June 3, 1987.

The defendant first contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. More specifically, he argues that the testimony of the State's "key witnesses," Tina Rose, Steve Howland, Cynthia Proffer and Rosemary Hickerson, was inconsistent, incapable of belief and questionably motivated.

■ Illinois courts have often held that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. (*People v. Foster* (1979), 76 Ill. 2d 365, 373, 392 N.E.2d 6, 9.) Where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. (76 Ill. 2d at 373, 392 N.E.2d at 9.) The test to be applied in reviewing the sufficiency of evidence in criminal cases is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Under these standards of review, we find no reason to reverse the jury's determination that there was sufficient evidence of the defendant's guilt.

The defendant contends that the testimony of the State's chief witness, Tina Rose, was unbelievable because she was a narcotics addict who was an accomplice to the crimes involved herein, had told conflicting stories about them, and had obtained immunity in exchange for her trial testimony. However, even had the validity of all these claims been established, their existence would not prove fatal to Ms. Rose's credibility.

Ms. Rose admitted that she was a narcotics addict at the time the crimes were committed in October 1985 and that her use of narcotics had increased by December 1985 when she made statements to Rodney Mullane. However, at the time she gave her statement to police in April 1986, she was receiving methadone treatment for her drug addiction, and in June 1987, when she testified at the defendant's trial, she no longer considered herself addicted. Therefore, the jury may have given little consideration to Ms. Rose's history of drug addiction.

■ Even if the jury had considered Rose's addiction as bearing on her credibility, it does not follow that her testimony must necessarily be disbelieved, especially when it was corroborated by other evidence and testimony. (See *People v. Smith* (1968), 41 Ill. 2d 158, 161, 242 N.E.2d 198, 200, *cert. denied* (1969), 396 U.S. 853, 24 L. Ed. 2d 101, 90 S. Ct. 111.) The defendant's telephone bill, which reflects two calls to Schrom's home on the night of October 6, 1985, supports Ms. Rose's testimony that he made a call before leaving for Edwardsville. Steve Howland's testimony concerning the defendant's jailhouse admissions to him further corroborates Rose's testimony. The account the defendant gave Howland was essentially the same as that presented by Rose at trial—that the defendant and a friend named

Fischer had shot and killed three people in an incident concerning money owed for drugs.

■ The defendant further contends that Ms. Rose was an accomplice and that accomplice-witness testimony is to be viewed with suspicion. However, the evidence presented at trial did not establish that Ms. Rose was an accomplice. An accomplice is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of a crime. (*People v. Robinson* (1974), 59 Ill. 2d 184, 190, 319 N.E.2d 772, 776.) The term "accomplice" does not embrace one who has guilty knowledge, is morally delinquent or who was even an admitted participant in a related but distinct offense. (59 Ill. 2d at 191, 319 N.E.2d at 886.) Rather, an accomplice must have had the requisite intent and before or during the offense he must have aided in its commission. *People v. Allen* (1983), 119 Ill. App. 3d 186, 193, 456 N.E.2d 336, 341.

■ Here, Tina Rose was merely present before and after the crimes because she had agreed to give the defendant a ride so that he could collect some money. She had no intent to commit the offenses which occurred, but instead, after learning that the defendant and Fischer planned an armed robbery, told them that she did not want anything to do with it, and demanded to be let out of the car. Her actions of discarding evidence, accepting money and drugs from the armed robbery, and driving the defendant and Fischer back to Alton occurred only *after* the offenses had been committed and were thus insufficient to make her accountable. See *People v. Coddington* (1970), 123 Ill. App. 2d 351, 371, 259 N.E.2d 382, 392.

The defendant also contends that Ms. Rose's testimony is unworthy of belief because she made statements to police informant Rodney Mullane that conflicted with her trial testimony. However, Ms. Rose explained that at the time she told Mullane that she, Jody Wesley and two of his friends robbed and shot a drug dealer in Edwardsville, she was "blowing [Mullane] a lot of hot air" because she wanted Mullane to fear Wesley and to stay away when he and Tommy House visited her and brought her drugs. She later told Mullane that neither Wesley nor House was involved in the Edwardsville murders, but rather that she had driven Fischer and two others to the scene and that Fischer had shot one of the dealers. This statement is similar in most respects to both the statement Rose gave police and to her testimony at trial. Thus, Rose gave a plausible explanation for her prior inconsistent statements and her trial testimony was supported by evidence of prior consistent statements.

The defendant lastly alleges that Ms. Rose's testimony is suspect

because she gave it in exchange for a promise of immunity. However, Ms. Rose's April 14 statement to police paralleled her trial testimony and was made before she had been charged with home invasion and armed robbery or given any promises in reference to her cooperation. While it is true that Ms. Rose anticipated that the charges against her would be dismissed, she denied receiving any promises to this effect from the State. Further, as we have noted, Ms. Rose was not an accomplice to the crimes. Therefore, it is probable that she believed the State's decision not to prosecute her was based on a lack of evidence rather than a promise of immunity.

■■ ■ However, in exchange for her cooperation, Ms. Rose did receive consideration in sentencing on her guilty plea to unlawful delivery of a controlled substance. Similarly, Cynthia Proffer obtained a reduced sentence for her husband in exchange for her testimony. When it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it the "absolute conviction of [the] truth." (*People v. Williams* (1976), 65 Ill. 2d 258, 267, 357 N.E.2d 525, 529-30.) We cannot say that the testimony of Ms. Rose and Mrs. Proffer did not carry with it such a conviction in this case.

■■ ■ The defendant also attacks the credibility of Steve Howland and Rose Hickerson, arguing that their testimony is suspect because he was a "convicted felon" and she a "drug dealer *** serving a federal sentence." While it is true that the jury can use evidence of a witness' prior convictions to question his credibility (*People v. Walker* (1987), 157 Ill. App. 3d 133, 137, 510 N.E.2d 29, 32), here, Howland's testimony was bolstered by his lack of motive to testify falsely and Hickerson's by corroborating evidence.

Howland voluntarily came forward with information about the defendant's admission to the murders and neither asked for, nor received, any special consideration in return for the information. Any favorable action taken with regard to petitions to revoke Howland's probation, subsequently filed, is irrelevant where, at the time he came forward, he was not yet "in any trouble" and where he had successfully completed his probation term prior to testifying at the defendant's trial.

Ms. Hickerson's testimony that the threatening message on her answering machine was left by the defendant was confirmed by both Cynthia Proffer and Jennifer Whitworth's identification of the defendant's voice. Further, and contrary to the defendant's claim, Ms. Hickerson's testimony was consistent, where she continually maintained that although she had dealt with the defendant and wanted him to

pay her for the marijuana she had sold him, she had not sent him to Schrom's house to obtain the money.

The jury was fully aware of the character of the witnesses and the circumstances of their testimony and was thus able to weigh these factors in assessing their credibility. Given the fact that these witnesses' testimony was corroborated by other evidence or contained other assurances of credibility, this court cannot say that the jury's judgment was in error. Thus, we find that the evidence supported the jury's verdict and that the defendant was proven guilty beyond a reasonable doubt of murder, home invasion and armed robbery.

■■ The defendant next asserts that the circuit court erred in making certain evidentiary rulings. Evidentiary rulings lie within the discretion of the circuit court and will not be disturbed on review absent an abuse of that discretion. *People v. Boclair* (1989), 129 Ill. 2d 458, 476, 544 N.E.2d 715, 723.

■■■ ■ The defendant initially contends that the trial court erred in refusing to allow defense counsel to present detailed evidence of the immunity from prosecution on home invasion and armed robbery charges given Tina Rose in exchange for her testimony. Following Rose's testimony at trial, defense counsel moved that the court take judicial notice and the jury be informed of the State's discovery answer filed on May 28, 1987, which stated in part:

> "(A) Tina Rose. The State has promised to grant immunity from prosecution for any criminal acts, if any, that her testimony may reveal, pertaining to the murders of Christopher Schrom, Della Riggins, and Kevin Burch, except perjury. Tina Rose pled guilty to unlawful delivery of a controlled substance on January 28, 1987 and was placed on probation for two years, the first year to be under intensive supervision. The State has agreed to dismiss all charges against her pertaining to the offenses of home invasion and armed robbery in 86—CF—327 and unlawful delivery of a controlled substance in 86—CF—223."

The circuit court denied the defendant's motion, stating that Ms. Rose had testified to both her understanding that the charges against her in this case would be dismissed and to the probation sentence received for her drug conviction, and that this information was sufficient for the jury. The circuit court's ruling was correct. The defendant was not prejudiced by the court's refusal to allow the discovery materials into evidence, where he was afforded the right to cross-examine Ms. Rose about arrests and charges which did tend to show that her testimony might be influenced by interest, bias or a motive

to testify falsely. See *People v. Triplett* (1985), 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15.

In addition to Ms. Rose's testimony, Deputy Sheriff Tune testified that Ms. Rose was told she would not be prosecuted for the armed robbery and home invasion charges. Thus, the jury was accurately informed that the charges were to be dismissed. To have characterized the dismissal as based on a promise of immunity would have been inaccurate, since, where Ms. Rose was not an accomplice to the crimes, the strength of the charges against her was dubious.

Moreover, as the State suggests, the record reveals no evidence that the circuit court was ever asked to grant Tina Rose immunity in exchange for her testimony. Although the right to grant immunity is a power awarded to the State by the legislature (*People v. Frascella* (1980), 81 Ill. App. 3d 794, 798, 401 N.E.2d 1045, 1047), without the court's order, no grant of immunity exists. See Ill. Rev. Stat. 1987, ch. 38, par. 106—1; *People v. Hamm* (1985), 136 Ill. App. 3d 11, 23, 482 N.E.2d 1103, 1112, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1475 (a grant of immunity under statutory authority must be in strict compliance with the terms of the statute).

The jury was also adequately advised of the impeaching evidence concerning Ms. Rose's drug conviction. Although the discovery material in question stated that one unlawful delivery of a controlled substance charge was to be dismissed, Ms. Rose's testimony was unclear on this point. However, the defendant's attorney argued to the jury that Rose had received probation on one drug charge and that the other had been dropped. Additionally, the record reveals that the jury received a certified copy of the order and judgment on plea and sentence for only one unlawful delivery charge. Therefore, the circuit court did not abuse its discretion in refusing to admit the discovery material.

The defendant next alleges that the trial court erred in allowing the State to present evidence concerning a .22 caliber Ruger handgun belonging to the defendant's roommate, David Schenk. Schenk testified that the gun had been missing for several days while Tony Fischer was staying with Schenk and the defendant during the fall of 1985. Schenk stated that the gun reappeared after he mentioned its disappearance to the defendant, and that it was never seen again after December 1985 or January 1986.

Testimony concerning a weapon may be admitted into evidence where there is proof connecting the weapon to the defendant and the crime. (*People v. Wade* (1977), 51 Ill. App. 3d 721, 729, 366 N.E.2d 528, 534.) However, it is only necessary that the weapon be

suitable for the commission of the offense, it is not necessary that it be the weapon actually used in the offense. (*People v. Free* (1983), 94 Ill. 2d 378, 415-16, 447 N.E.2d 218, 236, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) Further, proof of the connection between the weapon and the defendant or the crime may be circumstantial, and the determination of the evidence's admissibility is within the circuit court's discretion. *People v. Givens* (1985), 135 Ill. App. 3d 810, 819, 482 N.E.2d 211, 217.

Here, evidence presented at trial showed that although the murder weapon or weapons were never found, the victims were killed by .22 caliber gunshots. A Ruger-manufactured weapon was one of approximately 13 types which could have fired the shots, and both the defendant and Fischer had access to such a weapon around the time of the murders. Therefore, Schenk's testimony was admissible as circumstantial evidence under the standards outlined above.

The defendant correctly states that no evidence positively established that Schenk's gun was taken from him by either the defendant or by Fischer, or that it was used by the defendant or Fischer to commit the murders. However, the weight to be given Schenk's testimony was a determination for the jury. Further, once a weapon is connected to an offense and there is evidence that multiple persons participated in the offense, evidence concerning the weapon may be admitted against all, even though they did not wield or possess it. *People v. Ramsey* (1986), 147 Ill. App. 3d 1084, 1091, 496 N.E.2d 1054, 1059; *People v. McClinton* (1978), 59 Ill. App. 3d 168, 176, 375 N.E.2d 1342, 1349.

The defendant also argues that the circuit court erred in refusing to allow him to present evidence that Jody Wesley had told Earl Bradley Flowers that Wesley had killed one of the victims. In an offer of proof, Flowers testified that he had known Wesley for four or five years and that between June and October 1986, Wesley made statements to him about the crimes at the Schrom residence. In June 1986, Wesley told Flowers that he had taken part in some crimes that had occurred in a remote area near Edwardsville, that he had shot "the girl" in the head and that it was "the ultimate high of his life." Wesley told Flowers that he, Tommy House, the defendant, Tony Fischer and Tina Rose had gone to the Schrom residence to purchase cocaine. Flowers testified that he and Wesley were "real high" on cocaine when Wesley made these statements.

On cross-examination during the offer of proof, Flowers admitted that he had not divulged any of this information to law enforcement officials until several weeks before trial, when he approached the

prosecutor about the conversations. Flowers also admitted that he had recently had a "falling out" with Wesley and that they were no longer friends.

■■ Generally, an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay, though the declaration is against penal interest. (*People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995, 999.) However, where justice requires, such an extrajudicial declaration may be admissible under the statement-against-penal-interests exception to the hearsay rule where there are sufficient indicia of trustworthiness. *Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049; *Bowel*, 111 Ill. 2d at 66, 488 N.E.2d at 999.

In *Chambers*, an extrajudicial statement was held admissible because the court found four factors which were sufficient indicia of trustworthiness: (1) the statement was made spontaneously to a close associate shortly after commission of the crime; (2) other evidence corroborated the statement; (3) the statement was self-incriminating and against the declarant's penal interests; and (4) the declarant was available for cross-examination. (*Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.) In *Bowel*, the Illinois Supreme Court held that these four factors "are to be regarded simply as indicia of trustworthiness and not as requirements of admissibility. The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, 488 N.E.2d at 1000, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.

■■ In the instant case, the statements made by Jody Wesley to Earl Bradley Flowers were not made under circumstances that provide "considerable assurance" of their reliability. While the statements were made spontaneously to a friend of Wesley's, they were made at least eight months after the crimes occurred. Although the statements were self-incriminating and against Wesley's interest, there was no opportunity to cross-examine Wesley at trial.

Further, and contrary to the defendant's assertion, Tina Rose's early statements to Rodney Mullane, naming Wesley as a participant in the crimes, are of little corroborative value where they were later directly repudiated by Rose. The fact that Wesley made these statements when both he and Flowers were "really high" on cocaine casts additional doubt on the statements' trustworthiness (see *People v.*

*Green* (1988), 179 Ill. App. 3d 1, 19, 535 N.E.2d 413, 424), as does Flowers' failure to promptly report this information to the authorities and his recent "falling out" with Wesley.

Wesley's statements did not carry the requisite indicia of trustworthiness. Furthermore, they did not absolve the defendant of guilt, where they placed him at the scene of the murders for the illegal purpose of obtaining cocaine. (See *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 175, 387 N.E.2d 1284, 1291.) Therefore, the circuit court did not abuse its discretion in barring Flowers' testimony.

 The court was also correct in refusing to allow into evidence the defendant's voice exemplar, made for the purpose of proving that it was not his voice on People's exhibit No. 54, the Hickerson answering machine tape. In an offer of proof, the defendant presented the testimony of Ross Gentile and James Terry in support of his attempt to have his voice exemplar admitted into evidence and played for the jury.

Ross Gentile, the owner of a recording studio, testified that on February 12, 1987, he went to the Madison County jail and made an audiotape of the defendant's voice as he repeatedly read from a transcript of the Hickerson tape. Gentile stated that the Hickerson tape was played "many times" for the defendant, and that Gentile "for over two hours, tried to coach [the defendant] to duplicate the voice inflection on the tape." A voice exemplar tape was made by telephoning Mr. Gentile's studio and recording samples of the defendant's duplication efforts onto the studio answering machine's cassette. Gentile testified that in his opinion, the defendant had not disguised his voice on the voice exemplar.

Sergeant James Terry of the Madison County sheriff's department testified that he was assigned to prisoner transportation and had frequently conversed with the defendant during the course of the trial. Sergeant Terry stated that he had heard the voice exemplar tape and that while the defendant appeared to use "different pitches and tones," it was "clearly [the defendant's] voice." Following the offer of proof, the circuit court granted the State's motion *in limine*, precluding the admission of Gentile's testimony and the voice exemplar tape, stating that the defendant had no right to manufacture evidence and that it was clear that this tape was a "staged production."

In *People v. Rosenbaum* (1921), 299 Ill. 93, 94-95, 132 N.E. 433, 434, the Illinois Supreme Court held that a defendant being tried for forgery was not allowed to sign the forged name before the jury for the purpose of demonstrating that the forgery was not in his handwriting. The court stated that for the circuit court "[t]o have granted

such a request and to have permitted such evidence to go to a jury would amount to nothing more than giving the [defendant] an opportunity to fabricate evidence for himself by changing the style and character of his handwriting so as to deceive the jury." See also *People v. Hibbler* (1971), 1 Ill. App. 3d 263, 266, 274 N.E.2d 101, 103 (defendant had no right to offer in evidence, as a comparison in forgery case, writing of his made after the controversy over the signature arose).

The defendant herein was similarly not entitled to fabricate evidence. Where his voice exemplar tape was made under circumstances which failed to furnish any satisfactory guarantee of its genuineness, the circuit court did not abuse its discretion in refusing to allow the tape's admission into evidence.

The circuit court did, however, abuse its discretion in allowing into evidence Cynthia Proffer's testimony regarding the telephone conversation she overheard between Tony Fischer and the defendant. This portion of Ms. Proffer's testimony was hearsay which, contrary to the State's contention, did not fall within the co-conspirator exception to the hearsay rule.

■■ Under the co-conspirators' exception to the hearsay rule, any act or declaration (1) by a co-conspirator of a party, (2) committed in furtherance of the conspiracy and (3) during its pendency, is admissible against each co-conspirator, provided that (4) a foundation for its reception is laid by independent proof of the conspiracy. *People v. Eddington* (1984), 129 Ill. App. 3d 745, 771, 473 N.E.2d 103, 121; *People v. Goodman* (1980), 81 Ill. 2d 278, 283, 408 N.E.2d 215, 216-17.

In *Eddington* (129 Ill. App. 3d at 773, 473 N.E.2d at 122), the court held that a conspiracy includes subsequent efforts at concealment, but only if those efforts are proximate in time to the commission of the principal offense. "When acts or declarations directed toward concealment are distant from the commission of the offense, they are subject to such grave doubts as to their trustworthiness that they should not be admissible under the co-conspirators' exception to the hearsay rule." (129 Ill. App. 3d at 773, 473 N.E.2d at 122.) Based on this reasoning, the *Eddington* court found that taped conversations between co-conspirators, made more than three months after the offense, were inadmissible against the defendant. 129 Ill. App. 3d at 774, 473 N.E.2d at 123.

■■ Here, according to Proffer, the conversation between Fischer and the defendant occurred in April 1986, six months after the crimes were committed. Thus, as in *Eddington*, where the subject conversation did not occur during the pendency of the conspiracy,

Cynthia Proffer's testimony concerning that conversation was not admissible under the co-conspirators' exception to the hearsay rule.

On appeal, the State further argues that Mrs. Proffer's testimony was admissible as an implied admission by the defendant that he participated with Tony Fischer in the Edwardsville murders. The State contends that the defendant's statement that he "wasn't worried about Tina," made in response to Fischer's statement that he wanted the defendant to "get rid of Tina," was an acknowledgement of Fischer's intent that Tina Rose be killed because she might incriminate the defendant and Fischer in the crimes.

However, the case cited by the State in support of this theory is factually inapposite. In *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 771-72, 528 N.E.2d 1371, 1384, the appellate court held that a defendant's statements were implied admissions which supported an inference of guilt where they "indicated knowledge of the facts of the crime which were admissible to establish his guilt." Here, Proffer's testimony did not indicate any details of the crimes, nor were they even mentioned. The conversation overheard by Proffer was thus too vague to be considered an admission of the defendant's guilt.

Because Mrs. Proffer's testimony was, thus, inadmissible hearsay, the circuit court erred in allowing its admission into evidence. However, given the totality of evidence presented against the defendant, no reversible error occurred. (See *Lutwak v. United States* (1953), 344 U.S. 604, 619-20, 97 L. Ed. 593, 604-05, 73 S. Ct. 481, 490.) Although Proffer's testimony did tend to bolster the credibility of Tina Rose, as we have previously stated, Ms. Rose's testimony was adequately corroborated by both the testimony of Steve Howland and the defendant's telephone bill showing calls to the Schrom residence on the night of the murders.

The defendant next asserts that the circuit court erred in refusing to give certain jury instructions. The defendant first alleges that the court erred in refusing his tendered accomplice instruction as to State's witness Tina Rose. However, as we have previously determined that Ms. Rose was not an accomplice, the circuit court properly refused the instruction. See *Robinson*, 59 Ill. 2d at 192-93, 319 N.E.2d at 777 (where witness is not an accomplice, no error in court's refusal to give tendered instruction relative to the testimony of an accomplice); see also *People v. Chaney* (1987), 157 Ill. App. 3d 552, 562, 510 N.E.2d 997, 1013-14.

The defendant also contends that the circuit court erred in refusing his tendered instruction on the credibility of a narcotics addict, where the evidence established that Tina Rose was an addict at the

time of the offenses and at the time she made statements to police in April 1986. The defendant's proposed instruction read:

"Evidence that a witness was a narcotics addict at the time of the alleged crime and at the time the witness made prior statements concerning the alleged crime may be considered by you only as it may affect the credibility of the witness."

 In the absence of an Illinois Pattern Jury Instruction (IPI), the decision whether to give the jury an instruction rests within the trial court's discretion. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 834, 447 N.E.2d 1029, 1042.) Considering the jury's role as the sole judge of the facts, where cautionary instructions are concerned, the circuit court which confines itself to general instructions on credibility should be affirmed. *People v. Rollins* (1982), 108 Ill. App. 3d 480, 488-89, 438 N.E.2d 1322, 1328.

 Here, the circuit court refused the defendant's non-IPI instruction stating, in part, that "it usurps the function of the jury, especially where the jury is properly instructed as to the credibility of all the witnesses and *** as to the use of prior inconsistent statements." The court's ruling was not an abuse of discretion where it correctly stated the case law. See *Rollins*, 108 Ill. App. 3d at 488, 438 N.E.2d at 1328.

The defendant's final contention is that he was denied his right to a fair trial as a result of improper prosecutorial remarks made during closing argument. The defendant assigns error to prosecutorial argument that Tina Rose was not accountable for the offenses involved herein, and that David Schenk's gun had disappeared because it was evidence in a murder case.

 While the defendant objected to the prosecutor's comment that Ms. Rose "isn't chargeable with anything here as to this offense," no objection was made to the gun argument. Additionally, the defendant failed to specify which of the prosecutor's statements were improper in his post-trial motion, stating merely that the "defendant was prejudiced by remarks made by the prosecutor during closing argument." The defendant has therefore waived this issue for purposes of review. *People v. David* (1986), 141 Ill. App. 3d 243, 261, 489 N.E.2d 1124, 1135.

Further, in our view, neither argument constituted error. A prosecutor has great latitude in closing argument, and those statements made by a prosecutor which are based upon evidence presented at trial, as well as reasonable inferences deduced from that evidence, are within the bounds of legitimate argument. *People v. Tannahill* (1987), 152 Ill. App. 3d 882, 887, 504 N.E.2d 1283, 1287.

Here, evidence presented at trial showed that although Tina Rose had been charged with home invasion and armed robbery, those charges were to be dismissed. As we have repeatedly noted, Ms. Rose was not an accomplice to these offenses, and therefore any attempt to prosecute her for them would not be successful. Therefore, it was permissible for the prosecutor to argue that Ms. Rose was not legally accountable for the offenses.

Similarly, the prosecutor's argument that David Schenk's gun was the murder weapon was a fair inference drawn from the evidence. The defendant, in his reply brief, admits that the evidence presented at trial showed the gun's first disappearance could accurately be assumed in the fall of 1985. Where the evidence further showed that both the defendant and Tony Fischer had access to Schenk's .22 caliber Ruger handgun, and that that type of weapon could have fired the fatal shots, the prosecutor's remarks were proper. Thus, there existed no prejudice to defendant so as to deny him a fair trial.

For the foregoing reasons, the judgments of conviction entered by the circuit court of Madison County are affirmed.

Affirmed.

GOLDENHERSH and WELCH, JJ., concur.